This is an action which arises out of actions by a group of social workers for the County of Contra Costa that essentially ripped a family apart. The questions that were raised at trial and the issues that were presented, whether or not there was good cause or imminent danger to the children that were removed from the home without a warrant at the time they were removed, the consequences of those acts, and a secondary issue of whether or not the Romstad's foster parent license had also been revoked. Now, in order to determine whether or not the Romstad's received substantial justice during the trial of this matter, requires a look at the procedures and the rulings that the trial court made during the course of the pretrial procedures and during the course of the trial. Now, in this particular case, one of the key issues had to do with what Melissa Romstad told to various social workers at various times during the day before that she was removed from her home and on the day that she was removed from her home. One of those interviews, out of five interviews that took place, was videotaped. During the course of pretrial proceedings, plaintiffs attempted to get that videotape. We went to the court in Contra Costa County, which is the juvenile court, which has the exclusive jurisdiction over matters involving juveniles in the state of California. We obtained the order there, directing the county and the district attorney to produce it. It never was produced. The case went up on appeal. We went back to try and get it through a contempt citation. Got no reaction from the courts. So just prior to trial, we're getting ready, and the one unique thing about the federal system is the pretrial conference and the way it's set up. There was a scheduling order that was issued before the pretrial conference that said that all exhibits must be identified and exchanged not later than 30 days prior to the pretrial conference. That's under Rule 16b. Or excuse me, but they had to be done, which implicates Rule 16b. The defendants in this matter never identified the videotape as being a piece of evidence that they intended to introduce at trial. What was the relationship between the defendants and the group that had the custody of the videotape? Well, at the time the request was made, the county of Contra Costa was a defendant, and we were told that it, in fact, existed. However, later on, the county of Contra Costa was dismissed from the action. So the question becomes is who had possession of the videotape, with the defense position being that since we individually do not have the possession of this videotape, we should not be penalized for any failure to produce. That was the force of the motion in limine, and there's really four issues involved with regard to the videotape. First, I had a hard time evaluating this issue because I had no sense of what was in this videotape that would have been different than if it wasn't there at all. What's the prejudice? What was in it? You never told us, as I recall, really what was in the videotape and what would have why it mattered. It matters. Well, I think we did point out the fact that the videotape is a rather unique piece of evidence. We're talking about events that occurred five years prior to trial. The videotape is one snippet of the events. It's very vivid, and it's detailed representation of what occurred. Remember, we have four interviews of Melissa Romstad before the videotape was taken. Statements that were made in the videotape did not take place prior. When you look at what is the impact of that videotape on the trial, look at the trial judge's ruling when she ruled on qualified immunity for Melissa Romstad. The problem with the videotape is the person who is doing the questioning is not a witness, and she was not an identified witness in this case either. She never testified. The trial court noted in her ruling that the interviewer, Vicki Hill, in fact agreed that Melissa needed to be removed from her home. That testimony never occurred in court. It never occurred in the videotape. The videotape, and I think the cases that we cite point to the proposition that videotapes are really sui generis. They are a unique type of evidence that is powerful beyond. What is the relevance of all this to the suit, though? I mean, wasn't ultimately the judgment of the jury that the particular people you sued weren't, except for LaBeouf on whom they hung, were not the responsible people? It wasn't that this didn't happen or that it shouldn't have happened or that there wasn't even a constitutional violation. And they hung on LaBeouf, and then she was then, the district judge then granted judgment in her favor. Why would the videotape have made any difference to what seems to have been the determinative questions here? The videotape becomes more of a distraction. It becomes a central focus of a trial when the focus should be on other evidence. I guess what I'm really asking you is why are you putting your energy into this and whether LaBeouf should have had a judgment against her in her favor? Well, we did. That's my next issue is should the plaintiffs have been given the opportunity to amend the complaint to bring in the decision-makers? And that brings in Rule 15. And in this particular case, the request to bring in the defendants that were the decision-makers was denied by the court. There was no prejudice that was ever. In order to make a, there is great liberality in granting leads to amend in the federal court. Now, when exactly did you make the move to amend? I know it was after the case came back from the Ninth Circuit, and then what? I wrote a letter to the court. When, immediately? I think within a few days I wrote a letter. I think that the opinion came down on July 1st or the remand order came down. I wrote a letter I think on July 7th or within a few days requesting that we have a hearing, a scheduling hearing. And at the scheduling hearing, I made the request to file a motion to amend the complaint to include three new defendants who were the decision-makers. And when was the complaint originally filed, and how much later was this motion to amend? Two and a half years? Approximately two and a half years. But you have to remember the first seven months that the case was on file, there couldn't be any discovery because of the local rules, or the local rules. We finished the discovery at the same time that defendants' motion for summary judgment was heard. That motion was granted. There's no question. And that motion was on limitations grounds exclusively, largely, or what? The motion was granted primarily, it was granted primarily on absolute immunity under State law for social workers in making decisions to remove children from the home. If I had brought in the decision-makers at that point, it would have been futile because the Court had already ruled that all of the social workers had absolute immunity. So in other words, until you got a decision on whether there was absolute immunity, there was no point bringing these people in because there would just be more people who had absolute immunity. Correct. So once we came back and it was determined by this Court that absolute immunity did not apply, I applied to the Court for an order to allow me to amend the complaint to bring in those three decision-makers as defendants so that I could take care of this problem and have them there before the Court. The Court denied that. Now, if they had come in, and one of the oddities here is we don't have them here. They're not parties to this case, this appeal now. And is their prejudice, is the prejudice to them relevant now or would only be relevant if you actually had leave to amend, filed a suit, they could then come in and claim prejudice? In other words, do we now have to somehow conjure up what the prejudice to them might be, although they're not here? No, I don't think we do have to conjure up the prejudice. These persons, some of them were deposed prior to the case going up on appeal. Deposed when you think you're a defendant and to be deposed when you don't think you're a defendant. Right, but they were represented by the same attorneys that were representing the county and representing all of the other defendants and witnesses in the action. All of the witnesses were county employees except for my clients. Is there anything on the record as to if there ever were a damage judgment against any of these defendants, who actually would be responsible for the payment of that damage judgment? I did make that argument in the lower court. Not at the time the motion to amend was, or I guess I did make it. I'm a little more precise than that. I'm asking is there anything in the record as does an evidentiary matter. I'm not asking whether you made the argument. I don't recall anything in the record offhand where specific individual liability for money damage is. Obviously, the reason I'm asking that question is one can be a nominal defendant, but in truth if somebody else is picking up the tab, for example, your employer, you might feel a little differently about it. Right. And in this case, under the government code, all government employees who are sued under the four acts committed in the course and scope of their employment are in fact indemnified by the public. Is there a limitations period problem with regard to the three defendants you tried to add? No. Under rule of civil procedure 15C1, the applicable statute of limitations is the California statute of limitations with regard to bringing in DOE defendants. And as I pointed out in my opening brief, the time to bring in the DOE defendants would not have run until this January, January of 2004. So it's not a relation back problem. There's no relation back problem. 15C3, which was cited by the court, does not apply in this particular circumstance. You use the state statute of limitations and relation back theory. This led us to the main problem at the trial, which was Marcia LaBeouf was a social worker who actually removed Melissa Ramstad. Marcia LaBeouf told the supervisor that there was no danger to this girl. Marcia LaBeouf told the supervisor that the allegations of abuse as to the other children were basically unfounded. A jury, and in fact the jury in this case was understandably reluctant to find Marcia LaBeouf liable for removing those children when she was told to do so by the supervisor. The jury questions were, why don't we have the supervisor in front of us who made the decision and told that woman to remove those children? And I can't answer that question to the jury except to point out to the court, I tried to bring them in. And I think that in the human nature is that the person... Kagan. How long was the case pending? In other words, if you took out the seven months before discovery was available and the time that this case was pending in this court, how long, what's left in terms of the time before which you moved to add the defendants? It was two and a half years total. Right. So it was... Minus seven months, minus how long was it pending in this court? It was pending in this court, I think, 11 months. So minus 18 months. So it took minus 18 months. So the case was pending a total of seven months. Under California law, I have three years. No, I'm not asking that question. Okay. Okay. But that does bring us to the main point is, did the Romstads obtain substantial justice? And the answer to that question is no. The jury did not want to find... There was no question in Marcia LaBeouf's mind that the necessary requisites for removal of that child without a warrant had been met. No one... They didn't have anything in their record regarding her opinion once she heard from her supervisors. In other words, she had an opinion when she communicated to her supervisors. Her supervisors then essentially expressed a contrary opinion and ordered the child removed, right? Right. Did Ms. LaBeouf ever... Is there anything in the record about her opinion after that, her own opinion? In other words, did she express in any way that because her supervisors felt otherwise, she had revised her own opinion? I don't recall her ever saying that she ever changed her mind. I don't recall her ever saying that she changed her opinion. Why isn't she subject to qualified immunity then? Qualified immunity is available if, number one, the conduct is not unconstitutional. Number two, well, let me kind of backtrack. The conduct is actionable if, in fact, it is unconstitutional in its nature. The immunity applies if the constitutionality of the action that was taken was not well established at the time that the action was taken. Or if a reasonable person in the position of the defendant would believe that what he or she did was proper. Objectively reasonable. And objectively, the law was established not later than 1993 in the Ram v. Rubin decision from this court, which stated there must be imminent danger of physical or sexual abuse to the child before that child can be removed without warrant unless there's some type of exigent circumstance. Okay. Now, why wasn't she entitled to qualified immunity? We've got the standards all set up. Now, why wasn't she entitled to it? She doesn't meet the standards because objectively and, in fact, subjectively, she knew that what she was doing was wrong. Her opinion was the child was not in imminent danger. Correct. Her supervisor said the kid's in imminent danger. Get the kid out of there. The supervisor never testified at trial that she was in imminent danger. That's what she told Ms. Leboeuf. She never told her that she was in imminent danger. She said get the kid out of there. She said get the kid out. Right. And both of them knew what the standard was unless they forgot some place in between. So why don't you look at what Ms. Leboeuf knew? She had her opinion. She didn't know what her supervisor knew. But she knew that her supervisor had totally removed the child. So why isn't she entitled to qualified immunity? Because there is no qualified immunity for simply following orders. No, that's not the point. She didn't know what the facts her supervisor had that she didn't have. So, therefore, she doesn't know why her supervisor did. She's not standing in for her supervisor. She just knows what she knows. She gets orders to do something different. And we don't know what that supervisor knew, nor does she. So why isn't that qualified? It doesn't have to be perfect. No. But in this particular case, the supervisor only had information from Marcia Leboeuf. But did Marcia Leboeuf know that? That's the critical point. Did she know what the supervisor knew? She knew that her supervisor got all of her knowledge from her as far as she knew. Did she know that? Is that in the record? The supervisor testified that all the information that she had was the information. Okay, but that's a separate question. You look at the time when Ms. Leboeuf did what she did, and she's your bad guy here. She's the one you've got to focus on. And you look at what she knew and what the facts were, would a reasonable person in her position have done what she did? And it doesn't really matter what the supervisor knew in fact. What's important is what Ms. Leboeuf knew. And she didn't know what the supervisor knew. Isn't that correct? No. She could never know what the supervisor knows. Right. But the question at this point is we have a record. We have a judgment as a matter of law. So the issue is what could a reasonable jury infer with regard to the questions that Judge Nelson is asking? And I don't know the record well enough to answer that question. But if, for example, the record says that this is every – that she collected all the information, she's the person who gave it to her supervisor, and if there's nothing in the record that suggests the supervisor knew anything else, could the jury infer that the supervisor knew nothing – that she knew the supervisor knew nothing else? Could the jury infer – the jury could infer that, but in this particular case there was no judgment of the jury with regard to Marcia Leboeuf. I understand. It was a hung jury. But to get back to that question is what would – focusing on the knowledge of Marcia Leboeuf, it's not what she thought her supervisor might have known. It's whether she could objectively and reasonably believe that her action met constitutional standards. But there is something in what Judge Nelson is saying. I mean, suppose that – suppose that unbeknownst to her, her supervisor had either gone out and done a separate inquiry or had a long history of dealings with his family and therefore had a better way to judge whether to believe or not to believe Melissa or something. Does – is she precluded from – and suppose the supervisor without telling her any of that says, you know, I just have – despite everything you say, I have other information than I think otherwise. Go do it my way. Is she entitled to rely on that at all? She might be. But that's not the record that we have. And I would like to reserve my one minute I noticed. You've got zero. But the truth is we will give you some rebuttal time. So we have your argument in hand and we'll give you some rebuttal. Thank you, Your Honor. Thank you, Your Honor. Good afternoon, Your Honors. I would like to, just at the outset, briefly address the issue of the proposed amended complaint, if I may. I'm sorry. Could you state your name for the record? Yes. Peter Edrington. Edrington, Sherman, Murphy, County of Contra Costa, et cetera. Thank you. It's the position of the defendants in this case that a plaintiff has waived any right to assert 15C1 as a basis by which the trial court should or could have granted his proposed amended complaint. The plaintiff filed their lawsuit in February 2000. Within four months, the county had provided documents which clearly set forth the relationship between three supervisors and the individuals who had been named in that action. No amended complaint was filed or no request to file an amended complaint. Several months later, November of 2000, Marcella Buck herself was deposed, and she testified at great length regarding the relationships between her supervisors and the other defendants in the case. Still, no proposed amended complaint was requested by the plaintiffs. Thereafter, the case came to the Court of Appeals and Summary Judgment, reversed in part, remanded in part, as the Court is aware. Now, Edrington, at what point, as we move along here. I'm sorry. I'm sorry. My fault. At what point during the course of the depositions do they learn in the deposition the precise relationship that you say they actually had heard before, and then comes the motion for summary judgment in which you argue that there is absolute immunity? At what point may they be thinking, you know what, I think I need to know whether there's absolute immunity before I try to amend? Well, in fact, the motion for summary judgment, which was filed in May of 2001, indicated that, in the view of the defendants, the plaintiffs had blown the statute of limitations on all the state action cases, and the Court agreed and all those were dismissed. We asked for absolute immunity for one or two of the defendants. It was granted for one of the defendants, and the Court of Appeals granted qualified immunity for another of the defendants, and they were dismissed from the action. There was a remand, however, on other issues, and those were addressed by jury trial. But nowhere in that period of time, even though the plaintiffs knew, because we'd provided them the information in writing, that the relationship between the supervisors and these individuals existed at all relevant times in this lawsuit. There was no effort made to seek relief from the Court to file a proposed or proposed motion. Was there a motion? Did you claim absolute immunity for Ms. LaBeouf? I'm sorry, Your Honor. I don't recall if we did. I expect we did not. I think we asked for qualified immunity for Ms. LaBeouf. But the Court sent we may have asked for absolute immunity. I just can't recall. I'm sorry. It's in the transcript. In any event, during the pendency of that motion, the plaintiffs could have returned to the trial court and requested the trial court to grant leave to amend their complaint. They didn't do anything until this court made its ruling on summary judgment. Now two and a half years have passed. When the motion was made to the trial court, there was no mention at all of CCP Section 474, which is the 15C1 implicates Section 474 of the California Code of Civil Procedure. It simply allows a party to add DOE defendants or name individuals as DOE defendants. But that wasn't why the district court denied the motion. That was not why the district court denied the motion, was it? Was it on limitations grounds? It was never raised. I know. Was it on limitations grounds that the motion was denied? Was the motion to add the defendants denied on limitations grounds? The summary judgment motion or the? No, the later motion to add the defendants. It was denied based on 15C3 in part by the trial court. And plaintiff indicated that the test under 15C is the California 474 CCP test, which allows three years after the date that summons issues. But that's not the only test under 15C. There are a variety of different mechanisms by which a court can grant or deny a request to allow a party to amend. We cited the court to 15C3. And that said that if the plaintiff doesn't seek his amendment within 120 days after the summons may issue, he's out of court on that. That's what we advanced to the trial court. The plaintiffs could have come to the trial court in a reply brief and said, wait a minute, Judge, we would prefer to rely on 15C1, which allows us to use CCP 474 and follow state law. But they didn't do that. They never raised that issue. They never raised the issue of no amendments in their motion. The trial court had no basis upon which it could divine, as we've heard today, that that was the true detail of the plaintiff's motion. But if he was wrong about 15C3, then he was wrong about it. Right? 15C3 was certainly a justifiable basis of how much the court could deny the motion. And we advised the trial court that 15C3 would, in fact, serve to deny the motion based upon the fact that it had been filed two and a half years after the complaint had issued. The plaintiffs didn't give the trial court any other basis upon which to go in a different direction. As a matter of fact, the plaintiffs didn't, and the court pointed out in its order, this court, the trial court, still does not have plaintiffs' reply to the defendant's opposition to this motion. Still, the plaintiffs didn't serve one. We then come along until we go to the court of appeals after the jury has ruled in our favor. Here we are at the court of appeals. In the opening brief, the plaintiffs do not raise the issue of CCP 474. It's never mentioned. They do not raise Federal Civil Procedure 15C1. None of that is properly before the court. The California Supreme Court in the TRW, excuse me, the U.S. Supreme Court in the TRW case has already told us that issues not raised in the opening brief cannot be considered by the court of appeals. Moreover, there's a case that this circuit decided, which I think is critical to this analysis, and that's the In Re, E.R. that, quote, issues not raised in the trial court sufficiently for a court to have ruled on them are waived. Therefore --" What was the ground for the district court's denial of the motion to amend? Yes, Your Honor. What was it? What was the ground? The basis was 15C3, which the plaintiffs had not timely served their motion. They were past the statute of limitations in that they ran beyond 120 days. All right. Now, suppose he was wrong about that. I don't think that one. I believe the court was correct. I don't understand the relevance of the 15C3. I mean, he was either right or wrong about that. No, because the different bases upon which a party can proceed to the trial court to seek an amendment are set forth in 15C. We elected to advance to the court the one that we believed was most favorable to us. Right. And if that was wrong --" Even the disjunctive. Yes. Okay. On four, I think there are four or five different bases. I understand that. And so you took a position, and if they can prove that your position is wrong, then why don't they win rather than lose? Well, if they had come in to the trial court and said, no, Judge, we would prefer that you look at this case under 15C1, which allows us to rely on CCP 474 and name these people as DOE defendants. Therefore, we don't have 120 days. We would have three years. We would have argued that at a subsequent hearing, or we may have addressed that to court in some other fashion. But they didn't give that information to the trial court. They never said, we want to proceed under this one of the alternatives. And we said, under this alternative, you're out of court on the issue of an amendment, because, as the trial court pointed out, that issue was never briefed to the court. It was not the court's duty to divine that the plaintiffs had a theory of which the court was never apprised. So the court properly denied that motion to amendment. There was prejudice to us in that two and a half years of lapse, and we've cited two cases to this court in which they talk about amendments filed after a year are prejudiced, can result in prejudice to defendants. Moreover, we had a trial date in this case. The date for dispositive motions ran the day after the motion to amend was filed. We would have had no time to file dispositive motions, conduct any discovery, and in plaintiff's motion, the court may recall, he told the trial court, there will be no need to continue this trial date. We would have been severely prejudiced and unable to respond. I wouldn't go over what the exact timing was. When they made apparently, did they in fact write a letter soon after the remand asking for a status conference? I don't remember that letter. All right. When was this? How soon after the remand was the status conference? Do you know that? The status conference was held, I think, two months later. Okay. And then when was the trial set for? March. Dispositive motions had to be filed by October 5th. And plaintiff's motion was filed by October 4th. We had a pretrial conference set. So we felt this would be to severely prejudice us because we didn't know another factor here, which I think the court was. So they didn't file it immediately after. Did they indicate at the status conference that they were going to file such a motion? They asked the court for permission to do it. Right. And the court said, yes, you may, and set a briefing schedule. And then they filed their. So they filed it on time in terms of how the district court set up the schedule from the time they asked to do it, which was two months after the remand. So the fact that it was October 4th was essentially because that was the schedule that the judge set up. The trial court permitted them to do so. But another, and I think failing, and I think it's fatal to their request to have an amendment, is the fact that they did not supply the trial court or us with a proposed amended complaint. Now, we've cited this court to the late case, which is still good law. And that case holds that failure to provide the trial court with a proposed amendment can result in the request for amendment being denied by the trial court. And the problem, of course, is plaintiffs had indicated that they planned to talk about new matters in this amended complaint. We had no idea what those new matters would be when we filed our opposition. And, of course, neither did the trial judge. So when Judge Hamilton reviewed this proposed amended complaint that didn't cite any specific subsection of 15C and did not contain a proposed amendment, then the trial court was certainly within its discretion to deny the motion based upon the disjunctive paragraph 3 upon which we had relied and which is law, which would apply in that case. I would like to, with the Court's indulgence, very briefly address a case cited by the plaintiffs, which they think should be controlling for this court in terms of the proposed amended complaint. They cite DCD programs. It is a Ninth Circuit case cited in both briefs. The cases are very different on the facts. Let me briefly delineate, if I may, those differences. In the DCD case, the court denied the proposed amendment without issuing any findings or reason for its decision. The Ninth Circuit said you have to give us something because we had to know upon which your discretionary decision was based. Number two, in DCD the suit was in its early stages and the plaintiff offered a satisfactory explanation as to why they couldn't discover the information as a predicate to filing the amended complaint. That certainly is the situation here. Two and a half years had passed and they had the requisite information four months after they filed their action.  That was not true in our case. Discovery had largely been completed, as the plaintiff indicated in his brief. Number four, there was no trial date pending. No pretrial conference had been set in DCD. In our case, there was a trial date and a pretrial conference date had been set, and the final date for filing dispositive motions had been set by the trial course. So the Ninth Circuit, this Court, found that there was abusive description and discretion absent any underlying reason for the trial court's decision. Can I ask you about the qualified immunity for Ms. Leboeuf? Yes, Your Honor. Obviously, we went to trial once on whether or not she was immune. The jury hung on the question. The standard given that the jury hung is basically the same as a summary judgment standard. That is to say that taking the evidence most favorable to her, excuse me, taking the evidence most favorable to the plaintiff, do they, as a matter of law, survive the summary judgment motion? Can you tell me, another way of saying that is, on the current state of the record, do they get to go to trial again on that question of qualified immunity? Why don't they get to go to trial again? Why, as a matter of law, is she entitled, as to say, on any view of the evidence, why is she entitled to qualified immunity? Well, I think she would be entitled to that inference if she were the prevailing party by the jury, but the jury kept hanging on their responsibility and kept sending questions back. Well, that's to say we have no decision. That's to say we have no decision from the jury. So it's as if it's never been to the jury. So at this point, it's as though she's never had a trial. So it's as if you were trying to make a summary judgment motion. We've cited the court cases, which were also relied upon by the trial court, in granting qualified immunity to Ms. LaBeouf after hearing all the testimony in the case. Ms. LaBeouf was brand new to this job. This was the very first type of investigation in child molestation that she had conducted. The first interview, Melissa was forthcoming at school, but the record shows in the second interview by a professional at the CIC, by the way, Marcy LaBeouf said, I'm glad she's going to CIC because I don't have the same experience. But after that interview, she continued to believe that the child should not be removed from her home. Is that correct? I'm sorry. After that interview, she continued to believe that the child should not be removed. After the second interview, she found that the mother was more credible than Melissa. Okay. But two other social workers who knew Melissa, who were more experienced than she, told her, we've always found Melissa to be credible. All right. So let me ask the question to you that I asked to your opponent. Is there anything in the record to indicate that Ms. LaBeouf herself revised her opinion as a result of what she was told by her supervisors as opposed to simply following an order? Yes, there is. Okay. And where is that? There are several things. First, Ms. LaBeouf testified that after her supervisor told her what the supervisor's direction was, she readily deferred, I believe that's an exact quote, readily deferred to her supervisor for a number of reasons. First, this was Marcy's very first case. The supervisor had made decisions in between 6,000 and 7,000 cases of holding a child or releasing a child from hold. Additionally, Marcy LaBeouf, after talking to the supervisor, was convinced that her supervisor had Melissa's best interest at heart. And then Marcy LaBeouf testified that she readily went along with the supervisor's decision based upon her greater experience, the fact she knew the supervisor had the best interest of the child at heart, and that Marcy was brand new to this and didn't have very much experience. Where is this in the record? Can you tell me that? Do you know where this is in the record? If you're offhand, don't go looking for it. But do you know where it is in the record? I'm sorry. Yes, please speak up. Do you know where this is in the record, the material that you're now citing? It would be in Marcy LaBeouf's testimony. Okay. Let me ask a different, go back to something that you said. You said that her two supervisors had independent knowledge of this child. Is that right? Independent of this child outside what they'd heard in this particular briefing from Marcy LaBeouf? I think what I heard you say was Ms. LaBeouf has some indication from her own knowledge as to whether this child is telling the truth or not. But I think I heard you say that her two supervisors had always found this child to be believable. That is to say, that suggests to me that they had some independent knowledge, independent of what Ms. LaBeouf told them, of this child. Yes. I'm sorry if I may have confused the court, and I apologize. There were two other more experienced social workers who had dealt with Melissa Ramstad, both of whom had found her to be credible. They shared that information with Marcy LaBeouf. Marcy LaBeouf passed all this information on to Mary Jensen, her supervisor. But Mary Jensen brought to that experience and the determination to restrain that child. I see. But the supervisor had no independent knowledge of this child. She had her experience in other cases and so on, but she had no independent knowledge about this child. In terms of being involved in this particular case investigation up to that point, that would be correct, yes. So I think Marcy LaBeouf, the cases that the court cited we cite, that the Vela v. White case, an inexperienced police officer had no reason to believe the instructions given to him by his superior officer would result in a violation of any constitutional rights. And I would also add, I believe Marcy LaBeouf also testified that she had no idea that in following her supervisor's direction, which she was convinced was in the best interest of this child, would in any way, shape, or fashion result in a constitutional deprivation of this child. That's not the question. The question is whether she should have known that given her appraisal of the situation. Right? It's a reasonable social worker who understood the situation as she understood it. Would know that there was a constitutional violation. Oh, I don't think so. I think any social worker in Ms. LaBeouf's situation, Your Honor, would clearly find that in removing the child pursuant to her supervisor's instruction would not result in a constitutional deprivation. I think it suspends logic. And I don't certainly suspect, suggest the court would suspend its logic. But it would suspend logic from all the rest of us if it were to be suggested that somehow the social worker who was brand new to the job would listen to the directive of the supervisor and say, well, you know, I think if I do this, I'll be violating the Fourth Amendment under these facts. I just think it's implausible. And I would earnestly entreat the court. But which cases are you relying on in particular? You mentioned a case that you said you were relying on for this proposition. Yes. There are two cases, actually, Vela v. White. Vela was decided before Harlow, wasn't it? 1983 and Brent v. Asheville. It was decided under the good faith standard. And it's not really very helpful right now. It was decided under the pre-Harlow good faith standard. It isn't very helpful for present purposes. Well, I think it's helpful. And factually, it's similar to the case that we have. Well, that may be. But it's applying a different legal standard. It's also a case upon which the court relied. Well, fine. But then he could be wrong, too. Okay. Thank you. Thank you very much. Now, you ran right up to your 20 minutes, but would you like a minute for rebuttal? Just one brief minute of rebuttal. Sure. I'll just deal with that. I wish I could take more time. Just to deal with Vela, in terms of Vela, the case, the facts of the case in Vela are substantially different. Here we had a social worker who had been investigating for over a day and a half on this particular issue. In Vela, we had a rookie police officer who's in a heat of confrontation. And his sergeant says, get that guy. Arrest him. And he does it. He has no independent knowledge other than the fact that he's in the heat of a confrontation. And his sergeant is telling him to do something. Here, it's entirely different. I mean, this is really a very profound question, isn't it? I mean, she, in fact, was in a very bad spot. And the real question is, are you saying that if she had no reason to not believe that her supervisors were operating in good faith in the basis of their experience, that she should have put her job at risk? That's what you're saying, essentially. I have nothing but sympathy for the predicament that Ms. LaBeouf found herself in. But the question becomes is, should she have known and what should she have done? And I can't place all the blame on Marcia LaBeouf. You have to blame it on the supervisor because they told her to do it. But the fact of the matter is, what she did was unconstitutional. It was wrong. They had plenty of time to get a warrant, to go to the juvenile court. My clients had voluntarily turned over Melissa into their custody 24 hours earlier. There was no, absolutely no reason why this could not have been brought forward. Was there any discussion, any indication in the record of a discussion between her and the supervisors about the possibility of getting a warrant? No, there was never any discussion. And, in fact, the supervisor testified that they never do. It's just not something that they do. The supervisor didn't even know when she testified at trial what the standard was, what the constitutional standard was. Okay. Thank you, Your Honor. Thank both of you for your helpful argument. The case of Romstadt v. Contra Costa County is now submitted for decision. The last case on our argument calendar this morning is Amodai. I'm not sure I'm pronouncing it right. Perhaps Amodai v. Nevada State Senate. It will be 20 minutes per side.
judges: T.G.nelson, W.fletcher, M. Berzon